KOCH et al. v. FEDERAL TRADE COMMISSION.

No. 11495.

United States Court of Appeals
Sixth Circuit.
July 8, 1953.

314.

Nathan B. Goodnow, Detroit, Mich., Robert D. Dunwoodie and Marshall M. Massey, Detroit, Mich., on brief; Dykema, Jones & Wheat, Detroit, Mich., of counsel, for petitioners.

Donovan Divet, Washington, D. C., W. T. Kelley, General Counsel, Robert B. Dawkins, Asst. General Counsel, Washington, D. C., on brief, for respondent.

Before ALLEN, MARTIN and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

This case arises upon a petition to review a cease and desist order issued against the petitioners by the Federal Trade Commission.

The complaint alleged that Koch Laboratories, Inc., and petitioners William F. Koch and Louis G. Koch, President and Secretary-Treasurer, respectively, of Koch Laboratories, Inc., were engaged in the manufacture and in the sale and distribution in interstate commerce of certain medicinal preparations designated as "Glyoxylide," "B-Q", and "Malonide Ketene Solution" and that, in the course and conduct of their business, petitioners William F. Koch and Louis G. Koch disseminated and caused to be disseminated, by the United States mails and by various means in commerce, false, misleading and deceptive statements and representations as to the therapeutic value of their aforesaid medicinal preparations for the purpose of inducing the purchase of these preparations.

It was alleged that through the use of these statements and representations petitioners represented directly or by implication that their product "Glyoxylide" is an adequate treatment for any type or stage of cancer, leprosy, malaria, coronary occlusion or thrombosis, multiple sclerosis, arteriosclerosis, angioneourotic oedema, obliterative endarteritis, asthma, hay fever, dementia praecox, epilepsy, psoriasis, poliomyelitis, tuberculosis, syphilis, arthritis, and osteomyelitis, any type of allergy or infection, abscess of the prostate gland, septicaemia, and insanity; that the product "B-Q" constitutes an adequate treatment for all infections and their sequelae, including gonorrhea, salpingitis, sinusitis, meningitis, infantile paralysis, septicaemia, streptococcus sore throat, pneumonia, undulant fever, malaria, coronary thrombosis, the allergies, diabetes, cancer, arthritis, and the degenerative diseases; that the preparation "Malonide Ketene Solution" constitutes an adequate treatment for the allergic diseases, infections, diabetes, cancer, double pneumonia, osteomyelitis, and postoperative meningitis, and that through the use of the term "for allergy, cancer, infection" to describe and refer to properties of the aforementioned products, they have represented such products to be of therapeutic value in the treatment of all infections, cancer and allergies.

The Commission in its findings of fact in general sustained the allegations of the complaint, held that the advertisements issued by the petitioners violated Sections 5 and 12 of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq. and ordered that the advertisements be discontinued.

The petitioners in their answer concede that the statements referred to in the complaint appeared in books, pamphlets and circulars published by them. While they contend that this printed matter had been distributed only to members of the medical profession, they admit that Exhibit 16, a booklet on "Chemistry's Victory Over Disease," and Exhibit 17, a booklet on "Clinical Demonstration of the Laws of Chemical Structure that Determine Immunity to Disease and Their Application in the Treatment of Patients" were distributed to

customers. Petitioners contended below and reiterate here that the statements as to the case histories included in the publications were entirely truthful, that those as to the operation of the drugs were statements of scientific theories or opinions, which were in fact their honest and well-considered theories, and the therapeutic value of the drugs was shown by the experience of physicians who used them. They also contend (1) that there is no substantial evidence to support a finding that they disseminated advertising to persons not members of the medical profession or that petitioners' advertising contained false representations of material fact, and (2) that, since representations of therapeutic value are statements of opinion, the Commission had no authority to pass upon them.

Pertinent copies of the Commission's findings and conclusions are appended herewith as Appendix 1.

Sections 5 and 12 of the Federal Trade Commission Act, with certain immaterial omissions, read as follows:

Section 5, Tit. 15, U.S.C.A. § 45,

" (a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce are declared unlawful.

\* \* \* \* \* \*

"The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations \* \* \* from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

Section 12, Tit. 15, U.S.C.A. § 52,

"(a) It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—

"(1) By United States mails, or in commerce by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics; or

"(2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in commerce of food, drugs, devices, or cosmetics.

"(b) The dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice in commerce within the meaning of section 45 of this title."

The burden of proof was on the Commission to establish the material allegations of the complaint. This burden was successfully carried. The evidence on issues of fact was largely controverted. However, the record as a whole supports the finding of the Commission that the representations were misleading and false in material matters, that the products have no therapeutic value, and that the advertisements were sent both to members of the medical profession and to lay persons.

Thirty-three physicians and scientists testified for the Commission to the effect that petitioners' products had no therapeutic value. Thirty-six witnesses, including twenty-nine physicians, testified on behalf of petitioners.

Petitioners urge and the record shows that the Commission's witnesses have had no clinical experience with their products. This objection goes to the weight but not to the competence of the testimony. The general medical and pharmacalogical knowledge of the doctors qualified them to testify as to the lack of therapeutic value of the Koch products. Charles of the Ritz Distributors Corporation v. Federal Trade Commission, 2 Cir., 143 F.2d 676, 679; Dr. W. B. Caldwell, Inc., v. Federal Trade Commission, 7 Cir., 111 F.2d 889; Neff v. Federal Trade Commission, 4 Cir., 117 F.2d 495; John J. Fulton Co. v. Federal Trade Commission, 9 Cir., 130 F.2d 85, certiorari denied November 9, 1942, 317 U.S. 679, 63 S.Ct. 158, 87 L.Ed. 544.

Moreover, the clinical data relied on by petitioners were shown by cross-examination to be based upon insufficient diagnosis or to be inaccurate because of such circumstances as the use of conventional treatment along with the product. For ex-

ample, benign lesions which are inflammatory were shown to be difficult to distinguish from true cancer. A claimed cancer of the oesophagus described in the case histories presented by petitioners was stated by an expert physician testifying for the Commission to present the symptoms of an abscessed throat. One case originated in carcinoma which caused removal of the uterus, ovaries, and tubes of a patient of one of the doctors who testified for petitioners. Radium treatment was also given. Because the patient suffered severe pain and experienced passage of blood through the rectum the doctor testifying for petitioners concluded that there was a metastasis which established that carcinoma of the rectum existed. He took no biopsy to confirm this. The expert testifying for the Commission concluded that the symptoms were those of delayed radium reaction and that there was no metastasis.

No biopsy had been taken in many of the cases presented in evidence claimed to involve malignant tumor. One witness for petitioners who stated that he found Glyoxylide more effective in the treatment of tumors than anything else said that he made no laboratory tests, took no biopsies, and diagnosed tumors by palpation. Another doctor who testified as to a number of claimed cures of cancer by the Koch method said that he preferred not to use a biopsy because biopsies cause "traumatism to the growth." This conclusion is disputed by a number of expert physicians. It is the weight of medical authority, as shown by this record, that, while even in biopsies there is a margin of error, microscopic examination of the tissue of a tumor is the most accurate test known for malignancy.

The Commission was clearly correct in its conclusion that the evidence relating to the case histories is not determinative as to therapeutic value of the drugs in question.

A principal contention is that the order of the Federal Trade Commission invades the protection afforded by Section 15 (a) of the Federal Trade Commission Act, 15 U.S.C.A. § 55. This section reads as follows:

"For the purposes of sections 12, 13, and 14—

"(a) (1) The term 'false advertisement' means an advertisement, other than labeling, which is misleading in a material respect; and in determining whether any advertisement is misleading, there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also the extent to which the advertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual. No advertisement of a drug shall be deemed to be false if it is disseminated only to members of the medical profession, contains no false representation of a material fact, and includes, or is accompanied in each instance by truthful disclosure of, the formula showing quantitatively each ingredient of such drug."

Petitioners claim that their material was distributed only to members of the medical profession. They do not assert that it contained any quantitative analysis of each ingredient of the drugs involved.

However, petitioners concede that they advertised in a medical journal which was sent primarily to the members of the medical profession but also to lay persons. Moreover, while structural formulae were given, no formulae showing quantitatively the ingredients of the drugs accompanied certain of the advertisements. For example, this omission exists in petitioners' Exhibits 2, 3 and 4.

Failure to comply with one of these prerequisites, namely, that an advertisement (1) be disseminated only to members of the medical profession, and (2) be accompanied in each instance by truthful disclosure of the formulae showing quantitatively each ingredient of such drug, would

have deprived petitioners of the benefit of the protective provision of Section 15 (a). Here both of the requirements were lacking. Petitioners' briefs do not indicate what formulae are relied on as giving a quantitative analysis of the drugs and, in fact, they do not deny in this court that there is no such analysis. Yet this is a vitally important requirement for the health and safety of the general public. It is essential that physicians and lay customers should be informed as to the proportions and relative weight of each ingredient. The order of the Federal Trade Commission in this respect did not violate, but on the contrary conformed to and carried out the purposes of Section 15 (a).

Another main contention is that there is no finding and there is no substantial evidence, exclusive of the question of therapeutic value, that petitioners' advertising contained false representations of material facts. But the complaint alleged violations of § 5 and § 12 as well as of § 15 (a). Section 5 of the statute covers unfair or deceptive acts or practices in commerce. It was shown that these drugs were sold in interstate commerce. Section 12 (a) forbids any "false advertising" for the purpose of inducing, or which is likely to induce, the purchase of drugs. This record shows that the advertising sought to induce the purchase of the Koch products. The representations were misleading and deceptive as to the identity of the diseases claimed to have been cured as well as to the effectiveness of the claimed cure. As hereinbefore indicated, the diagnoses of cancer cases particularly were unreliable. If the tumor was not malignant it was not true cancer.

The finding that the representations were deceptive and misleading in a material respect is amply sustained by the evidence. The fact that petitioners made the representations in good faith is immaterial. Decision whether material facts have been misrepresented does not depend upon the good or bad faith of the advertiser. Ford Motor Company v. Federal Trade Commission, 6 Cir., 120 F.2d 175. Cf. Perma-Maid Co., Inc., v. Federal Trade Commission, 6 Cir., 121 F.2d 282; Parke,

Austin & Lipscomb, Inc., v. Federal Trade Commission, 2 Cir., 142 F.2d 437. And the mere fact that words and sentences may be literally and technically true does not prevent their being framed so as to mislead or deceive. Bockenstette v. Federal Trade Commission, 10 Cir., 134 F.2d 369; Bennett v. Federal Trade Commission, D.C. Cir., 200 F.2d 362.

Petitioners urge that therapeutic value is not a matter of fact but of opinion and that it "can never be a 'material fact' that can be falsely represented within the contemplation of the last sentence of Section 15 (a) (1)."

The question is definitely posed because the exhibits include a book on "The Chemistry of Immunity," written by Dr. Wm. F. Koch and widely distributed among physicians, which explains in detail his theory of heightening the natural immunity of the body against disease. It also contains a number of case histories, together with photographs of patients before and after taking the Koch remedies. We think that this book does not fall within the provisions of the statutes here involved. It sets forth primarily matter of opinion. Dr. Koch's book is a detailed explanation of his theory and the fact that case histories are appended no more brings it within the reach of these statutes than would an outline of experiments made by Einstein appended to some pamphlet dealing with relativity. We also think that if these provisions of the statutes were construed so as to prohibit dissemination of such a book they would violate the First Amendment to the Constitution of the United States. It was not error for the Commission to consider this book and to quote extracts from it as throwing light upon the existence or non-existence of facts supporting the charge in the complaint, for the book was introduced by the respondents. However, we hold that it is not an advertisement covered by Sections 5, 12, or 15(a). We make a similar conclusion with reference to Dr. Koch's address before the College of Physicians and Surgeons of Quebec in 1939. If the record contained only these two exhibits, the Commission would not have jurisdiction in this proceeding.

But the record is not confined to Dr. Koch's book and his address. A number of publications in evidence are plainly advertisements and petitioners so denominate them in their brief. They include, in addition to a concise statement of Dr. Koch's theory, persuasive selling arguments to induce the purchase of the drugs and give detailed price lists. Thus, in respondent's Exhibit No. 2, "Koch's Synthetic Antitoxins," the following list is given:

"1:4 Benzoquinone ..... Five dollars per ampoule without syringe or needle

Glyoxylide Solution.... Twenty-five dollars per ampoule with loan of syringe and needle

Syringe and needle properly prepared and sterile ..... Two dollars"

Booklets which were distributed to the patients of the physicians purchasing Dr. Koch's remedies are also included in the record. These present primarily an advertising feature.

In general, the representations made in these publications are couched, not in the language of opinion, but in positive terms. The cases covered are persons in desperate physical condition. The cures are said to be complete and other statements calculated to induce purchase of the Koch products are made without qualification or expression of opinion. These statements taken together are misleading. The advertisements also contain material which, read in light of the case histories, amount to false statements of fact apart from therapeutic value. To head a case history "Cancer of Larynx", "Cancer of Breast", is to make a statement of fact. It is a question of fact whether a tumor is benign or malignant.

Moreover, the representations as to the value of the drugs were in positive language. Thus, speaking of the restoration of injured organs by the Koch treatment, the booklet "Important Facts About The Koch Treatment" says: "This treatment has won the highest honors in this regard, since many times cases of cancer of the uterus in the advanced stages have been so thoroughly cured by this treatment that the uterus was perfectly reconstructed in each instance and able to give birth to children. In this way also cancer of the throat has been so thoroughly cured that the vocal cords were reconstructed and the voice restored." In "Chemistry's Victory Over Disease" it is stated: "Cancer has been the challenge to medicine ever since the dawn of history. Here is a cure." Such representations constitute a positive declaration that the drugs have the therapeutic value ascribed to them in the advertisements. To the lay person the declaration that a drug does or does not have a certain effect is a representation of fact. The statement that a cancer case has been cured is a statement of fact.

Petitioners base their whole argument on this point upon the assumption that the finding of lack of therapeutic value is the only material finding made by the Commission with reference to false representations of material fact. This assumption ignores other questions of fact upon which the Commission squarely rules. For instance, in this connection, whenever petitioners represent that cancer has been cured after one injection of Glyoxylide, they make several simultaneous statements of fact. They state that the disease cured is true cancer. They represent by implication that the disease is permanently cured. They state that this result has been achieved by a Koch drug.

The Commission made findings upon all of these points. Its statement that the evidence of the petitioners was unconvincing because of faulty evaluation and inaccurate diagnoses was a finding of fact.

The Commission heard extensive testimony as to the existence of every kind of disease claimed to be cured by Koch treatments. It found as a fact that "very grave doubts" were warranted, as to various cases, whether a number of these diseases actually existed. It heard testimony that the various cases were cured and found as a fact that the improved condition manifested in some cases undoubtedly was attributable to conventional therapeutic treatment rendered prior to the administration of the Koch drug. All of these are findings of

fact upon questions of fact and all of them bear upon the misleading, deceptive and false character of the representations found to have been made.

 The important criterion is the impression that the advertisement is likely to make on the reader. Charles of the Ritz Distributors Corporation v. Federal Trade Commission, supra, 143 F.2d at page 679. The cases relied on by the petitioners arose for the most part under the Food and Drug Act which required the proving of a false or misleading "statement" and which, after 1912, required that a statement with reference to the therapeutic effect of such article should be "false and fraudulent." 37 Stat. 416. Cf. American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90. U. S. v. Johnson, 221 U.S. 488, 31 S.Ct. 627, 55 L.Ed. 823, construed specific statutory language of the Food and Drug Act. L. B. Silver Co. v. Federal Trade Commission of America, 6 Cir., 1923, 289 F. 985, and F. T. C. v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324, were decided before the passage of the Wheeler-Lea amendment to the Federal Trade Commission Act and involved injury to competition. Under the present Act the Federal Trade Commission has jurisdiction of all cases in commerce affecting the public interest whether or not competition is involved. A principal test as to whether a particular case affects the public interest is whether the misleading or deception of the public is shown. Thus Section 5(a) declares unlawful "Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce". Section 12 covers the dissemination of false advertising for the purpose of inducing the purchase of food, drugs, etc. Injury to competition need not be shown. Parke, Austin & Lipscombe, Inc. v. Federal Trade Commission, supra, certiorari denied 323 U.S. 753, 65 S.Ct. 86, 89 L.Ed. 603. Cases cited dealing with injury to competition are not controlling here.

 We deem it unnecessary to discuss in detail other objections raised by the petitioners, all of which have been considered. The record does not show that the Commission imposed the burden of proof upon petitioners. Extensive expert testimony was introduced in support of the charge of the complaint. Physicians of long experience and high standing with reference to diabetes and cancer testified that the drugs involved had no therapeutic value for these diseases. Testimony was given by a number of physicians that these drugs had no therapeutic value with reference to any disease. While it was conceded that the drugs in the dilutions described were harmless, extensive positive testimony was given in support of the complaint. Whether the petitioners rebutted the Commission's case is a question of fact primarily for the Commission to decide. That the Commission termed the petitioners' rebuttal testimony "unconvincing" in no way alters the fact that the burden of proof was amply sustained by the Commission.

The impartiality of the hearing is attacked and the decision of the Commission in effect is called perfunctory. In a case which presents over 7,500 pages of testimony, much of it involving detailed accounts of some 150 case histories put into evidence by petitioners, it can hardly be claimed that they were denied opportunity to answer the charges, or that the carefully drawn decision was made without consideration of the record.

The proceeding was to the interest of the public. 15 U.S.C.A. § 45(b).

 As to refusal to open the case for further testimony we note that the case had been reopened in 1945 upon petitioners' motion and further evidence had been presented. The application in question here was filed on December 23, 1947. Among other things it sought to introduce certain testimony with reference to a report of the Department of Agriculture of British Columbia. The trial examiner with whom this motion was filed found that petitioners had sought to take testimony of the same officers of the Department of Agriculture of British Columbia in an application to take depositions filed with the Commission on July 28, 1945. The Commission denied this application, pointing out that this evidence was in existence on October 27, 1944 when the respondents rested their defense. This is the second attempt to introduce evi-

dence as to a report which antedated the second motion to reopen the case by more than three years. It was not an abuse of discretion to deny this motion.

 Neither was it error, in view of the scope of the case as it developed, to make findings with reference to analogous experiments upon mice and cattle nor to include these findings in the final decision. The petitioners as a part of their case introduced testimony with reference to the use by a veterinarian of Benzoquinone upon a paralyzed dog and upon a cow that had mastitis.

 The order is not too broad. Bowles v. May Hardwood Company, 6 Cir., 140 F.2d 914, 916; Progress Tailoring Company v. Federal Trade Commission, 7 Cir., 153 F.2d 103. The Commission had wide discretion in its choice of a remedy deemed adequate to cope with unlawful practices in this area of trade and commerce. Jacob Siegel Co. v. Federal Trade Commission, 327 U.S. 608, 611, 66 S.Ct. 758, 90 L.Ed. 888; Federal Trade Commission v. A. P. W. Paper Co., Inc., 328 U.S. 193, 203, 204, 66 S.Ct. 932, 90 L.Ed. 1165.

The order of the Federal Trade Commission is affirmed, and the petitioners are ordered to obey the order of the Commission.

### Appendix I
### United States of America
### Before Federal Trade Commission
### Findings As To The Facts

Paragraph One: At the time this proceeding was instituted, the respondent Koch Laboratories, Inc., was a corporation organized, existing and doing business under and by virtue of the laws of the State of Michigan, and maintained its principal office and place of business at 8181 East Jefferson Avenue, Detroit, Michigan. Respondents William F. Koch and Louis G. Koch are individuals who have acted respectively as president and treasurer of respondent Koch Laboratories, Inc. Respondents William F. Koch and Louis G. Koch have been actively engaged in the conduct of the business of respondent Koch Laboratories, Inc., and have directed and controlled the sales and advertising policies of such corporate respondent.

Paragraph Four: Among and typical of the statements and representations contained in advertisements in periodicals, pamphlets, circulars and other promotional matter disseminated as aforesaid and caused to be disseminated or mailed by respondents subsequent to March 21, 1938, to doctors of medicine, including homeopathic physicians and other practitioners of the healing arts, including naturopaths, in furtherance of the sale and distribution of their preparations, are the following statements and representations:

"The basis of immunity is, after all, the vital principle, the oxidation mechanism. When its catalysis ceases, death is the result. When its activity wanes, the toxins that support pathogenic germ activity, that produce allergy, or that cause cancer, are not destroyed in the body, and can execute their effects. All of these toxins depend upon their free valencies between carbon atoms, between carbon and oxygen, and between carbon and nitrogen for their pathogenic photochemic action.

"Our synthetic antitoxins not only activate oxygen, but they activate the toxic free valencies of germ and allergy poisons to accept the activated oxygen and thus become burned to harmless structures. Therefore, our active principles are fundamentally and universally useful.

\* \* \* \* \* \*

"Synthetic Antitoxins
For the Infections—

. . .

1:4 Benzoquinone,

. . .

For the Allergies—
Malonide . . .
Ketene . . .
For Cancer, and the Degenerative diseases—
Glyoxylide, $O=C=C=O$

\* \* \* \* \* \*

"Glyoxylide

\* \* \* \* \* \*

for
Allergy
Cancer
Infection

\* \* \* \* \* \*

"B-Q

\* \* \* \* \* \*

'For the infections and their sequelae.

\* \* \* \* \* \*

"Angioneurotic Oedema. \* \* \* Condition seemed almost fatal for a half-hour before glyoxylide was given intramuscularly. In less than two minutes relief was perhaps 80 per cent. Recovery complete within one hour."

"Obliterative Endarteritis. \* \* \* Obliterative endarteritis, both legs and feet to the knees. Much pain, bedfast. Amputation at knees requested by surgeon. Blood sugar 380. One dose glyoxylide followed in three months by much improvement and in six months by complete recovery. Blood sugar 80. No return of trouble. \* \* \*

" \* \* \* Hay fever, asthma, severe sinusitis, generalized, pigmented, itching hives constantly. \* \* \* One dose of glyoxylide was given in May, 1934. Recovery complete in all respects within six months.

"Dementia Praecox. \* \* \* Recovery was complete in two years after two injections of glyoxylide solution. \* \* \*

"Epilepsy. \* \* \* One dose of glyoxylide solution given August 12, 1929, was followed by a gradual recession of the disease, so that by the twelfth week only a few petit mal were observed and thereafter recovery became complete with no more fits. \* \* \*

"Psoriasis. \* \* \* At the time of glyoxylide injection body was generally covered, hair and nails affected. Ears almost separated from scalp. Recovery completed and heart action returned to normal fourteen weeks after one injection of glyoxylide. \* \* \*

" \* \* \* Poliomyelitis. \* \* \* Recovery started to show within ten minutes after the first injection [Glyoxylide]. \* \*

"According to reports by expert clinicians more is accomplished in tuberculosis in three months by one dose of *Glyoxylide* than by five years of sanitarium care. Many of the most advanced cases of *tuberculosis of the lungs and bones* recover on one dose.

"The results in *leprosy, malaria, syphilis, multiple sclerosis,* and *infantile paralysis* are good, but no statistical estimates have been made as yet.

\* \* \* \* \*

"Cases of *insanity* and *epilepsy* have responded well also. Thus the field of action is general, *and the efficiency is extraordinary.*

\* \* \* \* \* \*

"One or two Doses are sufficient generally for complete recovery, where this is possible.

\* \* \* \* \* \*

"Selection of the Remedy

" \* \* \* They are all good.

"Arthritis. \* \* \* One dose of glyoxylide was given in December, 1927, pain was soon better and in three months she was able to walk a few steps. In one year recovery had become about ninety per cent of normal and has so remained. \* \* \*

"Tubercular Arthritis and Osteomyelitis. \* \* \* One dose of glyoxylide given July 23, 1934, was followed by rapid decrease in the pain and a steady restoration of joint and bone to normal, functionally and structurally, with perfect use of leg and full motion within nine months. \* \* \*

"A case of *abscess of the prostate* with *septicemia* becoming worse after Sulfathiazole recovered splendidly following a dose of *Glyoxylide.*

"In a series of some three hundred cases of asthma, eczema, and hay fever, over eighty-five per cent made full recoveries on one or two doses of Glyoxylide.

"We Recommend
BQ
1:4 Benzoquinone
In The Treatment Of All Infections
And Their Sequelae Including
Gonorrhea, Salpingitis, Sinusitis,
Meningitis, Infantile Paralysis,
Septicaemia, Streptococcus Sore
Throat, Pneumonia, Undulant Fever,
Malaria, Coronary Thrombosis,
The Allergies, Diabetes, Cancer,
Arthritis, Degenerative Diseases. \* \* \*

"Malonide, ketene solution, has served well in the *Allergies, Infections* and *Cancer,* \* \* \*.

322

"A boy of two with double *pneumonia* and *osteomyelitis* of the left tibia which had to be opened the full length; the prognosis given by all attendants was early death. Two doses of the Malonide Ketene solution brought full recovery with rapid recuperation. * * *

"A case of *postoperative meningitis* caused by the *Staphlococcus Pyogenes Aureus,* that had passed beyond the convulsive stage into *coma,* and was expected to pass on any minute, made a rapid recovery (ten days) on one dose of *malonide ketene* solution.

### "An Efficient Single Dose
### Treatment For Diabetes
### On a Full Carbohydrate Diet
### Without Insulin

\* \* \* \* \* \*

"The period of observation includes scattered cases treated since 1922 and recent systematic studies. The cases treated cover about every type known, including a few of diabetes insipidus.

\* \* \* \* \* \*

"* * * Through use of the expressions 'for the infections,' 'for the allergies,' and 'for cancer, and the degenerative diseases' to describe and refer to the properties of their preparations, respondents have represented respectively that their products are of therapeutic value in the treatment of all infections, allergies, cancer and degenerative diseases.

"Paragraph Six: Designated in respondents' pamphlets and literature as constituting the Koch method, respondents' products have been sold in ampules variously containing two cubic centimeters or two and one-half cubic centimeters of solution and are designed to be administered by intramuscular or by intravenous injection.

\* \* \* \* \* \*

"To the product 'Glyoxylide' respondents ascribe the formula $O=C=C=O$ and in substance designate this preparation in some of the promotional matter as an aqueous solution of one part Glyoxylide to one trillion parts of water. The product 'B-Q,' also referred to as '1:4 Benzoquinone,' is an aqueous solution of one to one million parts of water. '1:4 Benzoquinone' is a recognized chemical entity. 'Malonide Ketene Solution,' sometimes referred to by re-

spondents as 'Ketene,' is stated by respondents to have two components. To the component which respondents designated as 'Malonide' they ascribe the chemical formula of $O=C=C=C=O$, which substance is said to be prepared as an aqueous solution of one part malonide and one trillion parts of water. The formula $O=C=C=C=O$ is the formula of carbon suboxide, a known product. $H_2C=C=O$, the formula of the other component, is referred to also as 'Ketene.' 'Ketene,' that is, the formula $H_2C=C=O$, is a known product.

"Respondent William F. Koch affirms that he has isolated the compound $O=C=C=O$, designated by him as 'Glyoxylide.' In the opinion of other scientific witnesses, including one trained in the field of biochemistry whose testimony was introduced in this proceeding by counsel supporting the complaint, the compound $O=C=C=O$ does not exist. A basis for this opinion is that various attempts to prepare the anhydride of glyoxylic acid, as reported in the scientific literature, have been failures. Assuming that it exists, however, it would constitute the anhydride of glyoxylic acid. If combined with water, $O=C=C=O$ would be transformed into glyoxylic acid and the transition normally would be a rapid one. With respect to the compound 'Malonide,' an aqueous solution of carbon suboxide when diluted to 10 to the minus 12 power would become malonic acid probably within an hour. $H_2C=C=O$, or Ketene, combined with water rapidly will form acetic acid, which acid is known to many persons because of its presence in vinegar.

"Inasmuch as it is asserted by respondents that their products are identical except with respect to the grade of their activity, further differentiation between them is unnecessary for the purposes of this proceeding. It is apparent, however, from the statements set out hereinbefore, that respondents' products represent highly dilute solutions. With respect to the product 'Glyoxylide,' for example, the relationship proportionately between one part $O=C=C=O$ and one trillion parts of water can be said to approximate mathematically that which one second bears in point of time to

the total seconds which have elapsed since the year 29,738 B.C. down to the date on which this case was orally argued before the Commission. There is testimony in the record to the effect that certain of the highly dilute solutions under consideration here cannot be distinguished from water by any tests known to chemical science.

"Paragraph Seven: The testimony of various scientific witnesses which was introduced into the record by counsel supporting the complaint is to the effect that the oxidation processes have no direct bearing on natural immunity, that the degenerative diseases and allergies are not caused by a defect of the oxidation mechanism of the body, and that although a decline in metabolic processes may cause more susceptibility to some types of infection, other forms of pathogenic germ activity are not dependent on the state of the oxidation mechanism. Moreover, the administration of substances such as thyroid and nitrophenols, which are known to increase oxidation in the body, are not effective treatments for infections, allergic diseases, or degenerative diseases, and in many cases they tend to make the disease worse or adversely affect the patient. In the opinion of certain of the witnesses, no valid scientific basis exists for ascribing to respondents' products any beneficial role whatsoever in connection with carbohydrate or glucose oxidation.

"The witnesses testifying in support of the complaint have had wide experience in various fields of medical science, including biochemistry, internal medicine, pediatrics and communicable diseases, pathology, diseases of the metabolism, and degenerative diseases, and they affirm, in substance, that respondents' products, irrespective of the dilution in which they may be used, are of no value in the treatment of any disease or disorder whatsoever. Although these witnesses have not prescribed respondents' products or observed their effects in concrete cases, their broad knowledge, individually and in the aggregate, respecting the fields under inquiry is such that their testimony should be accorded very great weight.

"Considered also is the evidence introduced into the record pertaining to several series of scientific experiments entailing the administration in various dilutions of diperoxide of diformaldehyde. The subjects were mice having tumors of spontaneous origin or in which various types of growths had been induced. The experimental procedures also utilized other groups of mice, for purposes of control, which received no injections of the peroxide. The conclusion of the scientific witness who conducted these experiments at an eastern university is that the product there under study had no effect, inhibitory or stimulatory, on such growths. The experiments with diperoxide of diformaldehyde are relevant to a consideration of the products here involved inasmuch as this peroxide is allied to the product designated 'Glyoxylide' and appears to have been used earlier by respondent William F. Koch in the treatment of cancer.

"The record here further reveals that a commission appointed pursuant to legislation enacted by the Legislative Assembly of the Province of Ontario, Canada, to inquire into treatments offered for cancer, in rendering official report under date of February 7, 1942, to the Minister of Health, stated that, in nine cases of cancer 'treated by Glyoxylide' and observed until final termination, no curative or remedial effects were observed from the standpoint either of prolongation of life, regression of tumor or suppression of symptoms.

"Paragraph Eight: In opposition to the allegations of the complaint, respondents have introduced testimony and other evidence relating to specific instances in which their products have been administered to human patients or to animals and other testimony respecting the opinions which certain of the witnesses who are doctors of medicine or practitioners of other healing arts have formed as to respondents' products. These opinions, formed primarily on the basis of their use of such preparations, are to the general effect that respondents' products have significant therapeutic value. It is urged by respondents that this testimony including that pertaining to in-

stances of actual use demonstrates that their products have substantial therapeutic value.

"It is the view of the Commission that the evidence relating to the case histories of these selected cases is unconvincing and that it constitutes a wholly inadequate basis for a conclusion that respondents' products possess therapeutic value. For instance, very grave doubts are warranted as to the correctness of the diagnoses made in various instances and this is particularly true in certain of the cases where, in the absence of corroborative biopsy, the patient was deemed to have cancer or to have had a recurrence of cancer. The improvement in condition apparently manifested in some instances following administration of one of respondents' products undoubtedly was attributable to such conventional therapeutic treatment as was rendered to the patient previously, simultaneously or subsequently rather than to the effects of the administration of respondents' products. In other instances the particular disease being treated belongs in that category of disorders the symptoms of which may be subject to complete or substantial remission causing them to disappear, perhaps to reappear months or years later, and in still others the diseases themselves are self-limiting and/or their symptoms are of definite duration.

"In no single category of the diseases and ailments does the testimony relating to clinical use in specific cases embrace a substantial number of cases, and in reference to more than 20 of such categories the testimony in each instance relates to use of respondents' treatment on one patient. The evaluation of a therapeutic preparation, however, requires study of a substantial number of cases correctly diagnosed. Evaluation, moreover, usually contemplates some knowledge of the ratio of cures to trials. Considering that respondents' products have been in existence for more than two decades, there is a singular lack of test data or information obtained from controlled clinical work to corroborate the representations for therapeutic value used by respondents in promoting the sale of these products.

"Paragraph Nine: The preponderant weight of qualified scientific opinion is that the oxidation processes have no direct bearing on natural immunity, that the degenerative diseases and the allergies are not caused by a defect of the oxidation mechanism, and that respondents' products have no beneficial role whatsoever in carbohydrate or glucose oxidation. On the basis of the greater weight of the evidence received in this proceeding, it is the conclusion of the Commission that respondents' preparations possess no therapeutic value and that their use in any dilution will not benefit any disease or condition of the human body or in animals.

"Paragraph Ten: The statements appearing in the advertising and promotional matter used by respondents, of which the statements contained in Paragraph Four hereof are typical and which, as found in Paragraph Five hereof, represent directly and by implication that respondents' products have therapeutic value in the treatment of the diseases, disorders and conditions referred to, including those statements which represent directly and by implication that the efficacy of respondents' products and their method of treatment is attested, demonstrated or proved by the results afforded in the clinical use of such preparations, constitute false representations of material facts. The Commission, therefore, finds that such advertisements are false and misleading and constitute false advertisements.

"Respondents contend that no public interest exists in this proceeding for the reason that dissemination of the advertising statements has been restricted to members of the medical profession having the requisite training to understand and evaluate therapeutic claims made for medicinal products. As previously stated, respondents' promotional literature has been disseminated to doctors of medicine, including homeopathic physicians, and to practitioners of other healing arts including naturopathy. It is noted, moreover, in this connection that representations phrased in somewhat different language but similar in general import to certain of the advertising

statements appearing in Paragraph Four hereinbefore, particularly as they relate to the treatment of cancer, also have appeared in media coming to the attention of the lay public. An example is certain folders furnished by respondents for distribution to patients of practitioners purchasing respondents' preparations. It is not true, therefore, that the dissemination of respondents' advertising matter has been limited to such persons as have the requisite training to accurately appraise the false representations of material facts appearing in the advertising, but, even if that situation had obtained, the provisions of, and the public policy expressed in the Federal Trade Commission Act, as amended, would require the corrective action being taken in this proceeding to eliminate the false representations found to have been made.

"Paragraph Eleven: The use by respondents of the advertising matter heretofore described has had the capacity and tendency to deceive and mislead prospective purchasers and purchasers of respondents' products into the belief that the statements and representations are true and, by reason of the erroneous and mistaken beliefs so engendered, to induce the purchase of respondents' products.

"Conclusion

"The aforesaid acts and practices as herein found have been to the prejudice of the public and constitute unfair and deceptive acts in commerce within the intent and meaning of the Federal Trade Commission Act.

"It appears from certain documents which have been filed on behalf of respondents, that subsequent to the institution of this proceeding, the respondent corporation, Koch Laboratories, Inc., was dissolved and that it does not exist as a corporation. In the circumstances, therefore, respondent Koch Laboratories, Inc., is not being included as a party to the order to cease and desist which is issuing separately herein. The documents referred to contain indication also that the sale and distribution of the products here involved have been discontinued by the respondent individuals. In the opinion of the Commission, however, the public interest, in the circumstances here requires issuance of an order prohibiting the respondent individuals from resuming or otherwise continuing the use of the unfair and deceptive acts and practices which were being used at the time and subsequent to the time when the complaint in this case was issued."