Maurice J. FEIL and Leo A Loeb, Individually and as Co-partners Trading as the Enurtone Company, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 16699.

United States Court of Appeals
Ninth Circuit.

Dec. 22, 1960.

880

Harold Easton, Los Angeles, Cal., for petitioner.

Daniel J. McCauley, Jr., Gen. Counsel, Alan B. Hobbes, Asst. Gen. Counsel, Jno. W. Carter, Jr., Washington, D. C., for the Federal Trade Commission.

Before BARNES and KOELSCH, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

Before us is a petition to review [1] an order of the Federal Trade Commission, to be referred to as "Commission" or "respondent", dated October 2, 1959, ordering Maurice J. Feil and Leo A. Loeb, individually and as co-partners trading as the Enurtone Company, to be referred to as "petitioners", to

1. 15 U.S.C.A. § 45(c).

"forthwith cease and desist from representing directly or indirectly:

"That the use of said device is of value in stopping bed-wetting or correcting the bed-wetting habit, unless expressly limited in a clear and conspicuous manner to cases of bed-wetting not involving organic defects or diseases."

This order modified the initial order issued on February 24, 1959, by one of the Commission's Hearing Examiners, which would have ordered that the petitioners

"do forthwith cease and desist from representing, directly or indirectly:

"That the use of such device is of value in stopping bed-wetting or in correcting the bed-wetting habit in cases of enuresis involving organic defect or diseases."

## I

### The Proceedings Before the Commission

The proceedings before the Commission were initiated by a complaint filed by the Commission, through its secretary, and dated June 7, 1956. The complaint, in substance, stated the following facts:

Maurice J. Feil and Leo A. Loeb are individuals trading as the Enurtone Company, with their principal place of business at Beverly Hills, California. For two years preceding the date of the complaint, they were engaged in leasing a device named "Enurtone", for use in cases of enuresis, or bed-wetting, in the course of which they have represented, by means of advertisements inserted in newspapers and circulars and other forms of advertising matter

"that the use of said device will stop bed-wetting and correct the bed-wetting habit in all cases."

They also furnished advertising materials to their lessees, who use it in soliciting the rental of the device.

The representations were false, misleading and deceptive in that the use of the device will not stop or correct bed-wetting

"except in cases of functional bed-wetting not involving organic defects or diseases."

There followed allegations that the petitioners were in substantial competition with others engaged in the leasing and sale of devices intended for the same purpose and that the use by the petitioners and their lessees of the false representations had tendency to mislead and deceive a substantial portion of the purchasing public into the erroneous and mistaken belief that the statements therein were true and to induce a substantial portion of the purchasing public to rent the device. The final allegations read:

"As a consequence thereof, trade in commerce has been unfairly diverted to respondents from their competitors and injury has thereby been done to competition in commerce. * * *

"The aforesaid acts and practices of respondents, as herein alleged, were and are all to the prejudice and injury of the public and of respondents' competitors and constitute unfair and deceptive acts and practices and unfair methods of competition, in commerce, within the intent and meaning of the Federal Trade Commission Act.

"Wherefore, the Premises Considered, the Federal Trade Commission, on this 7th day of June, A.D. 1956, issues its complaint against said respondents."

There followed notice of hearing before the Commission on August 21, 1956.

The Answer, dated July 6, 1956, admitted the partnership. It alleged that they were the exclusive licensees of the device under United States Letters Patent No. 2,644,050 and United States Letters Patent No. 2,127,538, up to the time of its expiration. Admitting that other concerns are engaged in selling enuresis devices they denied that they were in competition with them. They also denied that they or their lessees used any false, misleading or deceptive repre-

sentations or that their practices were injurious to the public or to their competitors.

The hearings began on September 24, 1956, before Hearing Examiner Edward F. Haycraft. At the conclusion of the initial hearing the then counsel for the Commission moved for an adjournment of the hearings to Chicago for the purpose of taking depositions of the Commission's medical experts. The motion was denied.

On March 11, 1957, the Commission substituted a new Hearing Examiner, Earl J. Kolb, who, over the protests of the petitioners, proceeded to hold the hearings on March 13. The new Hearing Examiner ordered that the hearings resume in Los Angeles on March 26, 1957, and that hearings be had for three days commencing May 1, 1957, in San Francisco, for the taking of medical testimony. When the hearings were resumed in San Francisco, counsel for the Commission was permitted to amend the complaint by adding at the end of Paragraph Five the words

"* * * or in cases of functional bed-wetting involving emotional tensions."

The effect of the amendment was to make Paragraph Five of the complaint read

"Paragraph Five: The said representations were and are false, misleading and deceptive. In truth and in fact, the use of said device will not be effective in stopping bed-wetting or correcting the bed-wetting habit in cases involving organic defects or diseases or in cases of functional bed-wetting involving emotional tensions."

An answer was filed by the petitioners denying the material allegations of the complaint, as amended. After the amendment was allowed, the Hearing Examiner sustained the objection of the petitioners to all the testimony theretofore given, ordered it stricken and ordered a trial de novo. Hearings were re-

scheduled and held at San Francisco on October 22, 23 and 24, 1958. The initial decision of the Hearing Examiner, filed on March 18, 1959, has already been given as has also the final order of the Commission, dated October 2, 1959, modifying it.

This is a petition to review the Order. Relief is sought upon the following grounds:

(1) The decision of the Commission is not supported by substantial evidence on the record considered as a whole;

(2) Assuming that there is substantial evidence on the record, considered as a whole, to support the Commission's finding that the use of the Enurtone device is not of value in stopping bed-wetting or in correcting the bed-wetting habit in cases of enuresis involving organic defects or diseases, the order of the Commission exceeds its powers and is, therefore, illegal and void.

On the basis of these contentions, it is urged that the following relief be granted:

(1) That the Final Order of the Commission issued under date of October 2, 1959, in Docket No. 6564 be set aside;

(2) In the alternative, in the event that the Court determines that the said Final Order should not be set aside, that the Final Order be modified to conform to the form of order contained in the Initial Decision of the Hearing Examiner issued under date of February 24, 1959.

## II

### Considering the Records as a Whole

#### A. The Scope of Review

The scope of review in a case of this character, as defined by the Act, as modified by the requirements of the Administrative Procedure Act, requires that the findings of the Commission be sustained unless they are

"unsupported by substantial evidence," [2]

or are

***

2. 5 U.S.C.A. § 1009(e) (5).

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[3]

These criteria have been applied by this and other courts in many recent cases.[4] They hold that it is the function of the Commission and not that of the reviewing court to pass upon the credibility of witnesses, the weight to be accorded to their testimony and to draw inferences from admitted facts. These cases insist that the Commission, *not we,* must resolve conflicts in expert medical testimony.[5] These rulings merely reemphasize the rule of substantiality long expressed by the Supreme Court that

"The weight to be given to the facts and circumstances admitted as well as the inferences reasonably to be drawn from them is for the Commission." [6]

■ The principle is applied with equal rigor in cases arising under Section 12 of the Federal Trade Commission Act, one of the objects of which is to prevent the dissemination of false advertisement for the purpose of inducing or which is likely to induce, directly or indirectly, the purchase, in commerce, of food, drugs, devices or cosmetics.[7] The orders will be sustained if shown to be of a character to warrant the infer-

---

3. 5 U.S.C.A. § 1009(e) (1).

4. Bristol-Myers Co. v. Federal Trade Commission, 4 Cir., 1950, 185 F.2d 58, 61–62; Tractor Training Service v. Federal Trade Commission, 9 Cir., 1955, 227 F.2d 420, 425; De Gorter v. Federal Trade Commission, 9 Cir., 1957, 244 F.2d 270, 272–273; Goodman v. Federal Trade Commission, 9 Cir., 1957, 244 F.2d 584, 590; Carter Products, Inc. v. Federal Trade Commission, 9 Cir., 1959, 268 F.2d 461, 493.

5. Justin Haynes & Co. v. Federal Trade Commission, 2 Cir., 1939, 105 F.2d 988, 989; Dr. W. B. Caldwell, Inc. v. Federal Trade Commission, 7 Cir., 1940, 111 F. 2d 889, 891; Neff v. Federal Trade Commission, 4 Cir., 1941, 117 F.2d 495, 497; D.D.D. Corp. v. Federal Trade Commission, 7 Cir., 1942, 125 F.2d 679, 680–682; John J. Fulton Co. v. Federal Trade Commission, 9 Cir., 1942, 130 F. 2d 85, 86; Aronberg v. Federal Trade Commission, 7 Cir., 1943, 132 F.2d 165, 170.

The teaching of these cases is summed up in a later case from the Seventh Circuit in this manner:

"Whether there is a consensus of medical opinion is a question of fact; *a conflict of medical opinion concerning the effectiveness of a preparation also presents a question of fact,* United States v. Kaadt, 7 Cir., 1948, 171 F.2d 600, 603, *and is therefore to be resolved by the Commission.*" Erickson v. Federal Trade Commission, 7 Cir., 1959, 272 F.2d 318, 321. (Emphasis added)

Coincidentally, the petitioner in that case urged, as do the petitioners in this case, that the Commission *should not* have rejected the testimonials from sat-

isfied customers. The answer of the court was:

"Further, it is sound to say that the fact that petitioner had satisfied customers *is not* a defense to Commission action for deceptive practices." Id., at page 322. (Emphasis added)

See, Keele Hair & Scalp Specialists, Inc. v. Federal Trade Commission, 5 Cir., 1960, 275 F.2d 18, 21–22.

These cases establish, without dispute, that the rule in the federal courts, at the present time, as applied specifically in cases reviewing orders of the Federal Trade Commission, is to give the trial agency the right to resolve conflicts between medical experts in *the same manner as they resolve conflicts between other witnesses,* and to adopt as conclusive the agency's determination of the conflict, if sustained by substantial evidence. So the teaching of the cases relied on by the petitioners, such as: United States v. Hill, 8 Cir., 1933, 62 F.2d 1022; Differential Steel Car Co. v. Macdonald, 6 Cir., 1950, 180 F.2d 260, 269; State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, 43–44, does not apply. In these cases the courts merely gave effect, one way or another, to the well known rule that opinion evidence *that contradicts proved facts* in the record is of little or no value. This is not the situation before us as the cases already cited show and as will be made demonstrably clear in the discussion to follow.

6. Federal Trade Commission v. Pacific States Paper Trade Ass'n, 1927, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534.

7. 15 U.S.C.A. § 52(a).

ences by the Commission that they are likely to deceive, although actual deception does not, in reality, appear.[8]

As the device is not sold but leased in commerce, the present proceeding was instituted under Section 5 of the Federal Trade Commission Act,[9] which declares unlawful

"Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." [10]

The Commission is empowered and directed by the Act to prevent persons, partnerships or corporations from using such methods, acts or practices in commerce. The Supreme Court has held that this and related sections

"empower the Commission to prevent the use of unfair methods of competition and authorize it, after finding an unfair method present, to enter an order requiring the offender 'to cease and desist' from using such unfair method," [11]

and that the Commission

"is clothed with wide discretion in determining the type of order that is necessary to bring an end to the unfair practices found to exist." [12]

■ So the questions raised on this appeal relating to the sufficiency of the evidence to sustain the cease and desist order entered in this case and the power of the Commission to frame it in the manner it did must be considered in the light of these principles. Before doing so, it is well to state that we have reached the conclusion that the order of the Commission is couched in language too broad by limiting the advertising to

"cases of bed-wetting not involving organic defects or diseases."

The word "involving" has many meanings, such as to

"have as a necessary circumstance, condition, or implication; to have effect on" [13]

and the like. By contrast, the word "caused" is simple, easily understood, and can be framed into an advertisement which would exclude from the bed-wetting cases for which the device is recommended the type caused by organic defects or diseases. An advertising so worded would be clearly understood as stating that the device is not helpful in cases of bed-wetting caused by organic defects or diseases, in accord with the most common meaning of the word "caused",

"to be the cause of; produce." [14]

### B. The Device and the Manner of Its Operation

■ In the light of this proposed modification of the language of the order, the problem before us is this: Is there substantial evidence in the record that the device is not helpful in cases of enuresis *caused* by organic defects or diseases?

The Enurtone device was invented by H. Wright Seiger, M.D., to whom United States Letters Patent No. 2,644,050 and No. 2,127,538 were granted. By assignment both patents are owned by the peti-

8. Reddi-Spred Corporation v. Federal Trade Commission, 3 Cir., 1956, 229 F.2d 557; Shafe v. Federal Trade Commission, 6 Cir., 1958, 256 F.2d 661, 663–664; Mueller v. United States, 5 Cir., 1958, 262 F.2d 443.

9. 15 U.S.C.A. § 45.

10. 15 U.S.C.A. § 45(a).

11. Federal Trade Commission v. National Lead Co., 1957, 352 U.S. 419, 428, 77 S.Ct. 502, 508, 1 L.Ed.2d 438.

12. Federal Trade Commission v. National Lead Co., supra Note 11, 352 U.S. 428, 77 S.Ct. 509.

"It is settled beyond dispute that in formulating its order to cease and desist, the Commission is empowered to determine the appropriate remedy according to the nature and character of the unfair practice." Erickson v. Federal Trade Commission, supra Note 5, 72 F.2d at page 322.

See, Koch v. Federal Trade Commission, 6 Cir., 1953, 206 F.2d 311, 320.

13. Funk & Wagnalls Standard Dictionary, International Edition, 1958, p. 670.

14. Funk & Wagnalls Standard Dictionary, supra Note 11, p. 212.

tioners. The first patent has expired. The main parts of the device are three, a pad, a control box and a carrying case. The carrying case is purely functional. The pad is of rubberized material containing an electrical bridge or insulator between opposite poles of a urine-sensitive metallic grid. The pad is placed in the bed of the user beneath the bed sheet. The user is not supposed to use night clothes below the waist. As the urination begins the electrical bridge is spanned and the low voltage electrical circuit in the pad is closed. A relay in the control box is activated, closing the main circuit, which rings a bell in the control box and lights a lamp or light in the sleeper's room. The bell awakens the sleeper who, in this manner, finds himself in a lighted room. The device is highly sensitive. A small spot of urine will activate it.

One of the partners in the petitioner's firm, in demonstrating the device before the Commission, summed up the relation between the parts in the method of operation substantially in this manner:

There are two essential parts; one is the control box which visually resembles a portable radio and there is a pad which is made of rubber in which there is an imbedded metal grill work which is urine sensitive. The size of the pad is approximately 19 by 23. Within the control box there is an alarm and a series of relays. The control box is connected to the regular house circuit, 110-circuit, and that voltage is reduced by a transformer within the control box down to approximately 6 volts which makes it hazard free. Then, upon urine contact with the pad, the circuit is broken and it activates the bell to ring and the light to go on simultaneously.

C. *The Claimed Efficacy of the Device*

Bed-wetting, enuresis, is an incontinence, especially night incontinence, of persons, especially children, who have reached an age when they should control their bodily functions, including urination. It may result from urethral irritation, cystitis and be associated with diseases, such as certain types of diabetes, or emotional disturbance. And it may be functional, or the result of delayed maturation or of bad habits. The medical experts presented by the Commission are in agreement that the device before the court, while *it might* help in functional cases, as might also awakening the child several times during the night, or a "paddling" administered at the proper time, ("a kick in the fanny", as one of the medical experts put it) *would not help* in enuresis caused by organic defects or diseases.

The petitioners distribute the device through lessees who are located in various parts of the United States. They lease the devices to users or parents or guardians of children who use them, who pay a flat rental fee. The lessees, in turn, pay to the petitioners a fee for each device in use. According to the petitioners' estimate, some 5,000 devices were in use while the proceedings were pending before the Commission.

The petitioners compose or collaborate in the composition of brochures and advertisements which are used by them and their lessees to promote the device. In these brochures and advertisements, which are in the record, stress is laid consistently on the fact that the device "stops" bed-wetting, implying *all bed-wetting*. Typical is the following advertisement:

"Dry Bed Training

Is Bed Wetting Torturing Your Child? You can Stop It. It costs nothing to learn how to help your child * * * Your request for information will be held in the strictest of confidence The Enurtone Method has proven in over 80,000 cases, from 3 to 30 years of age, that it can correct this humiliating habit in two to four weeks."

The top lines are in bold face, the headline "Dry Bed Training" in one-half inch capitals.

A brochure issued by the company is headed:

"New Happiness for Your Child

Doctors recommend this proven, drugless Method to Stop Bed-Wetting"

The last words "Stop Bed-Wetting" are again in bold face.

 Another advertisement reads: "did You know—"

Spoken by a person resembling a physician, followed by this advertisement:

"Bed Wetting can be Stopped! Yes, now the annoying and humiliating habit that restricts children as well as adults to their homes because it automatically rules out camp, vacations, trips or even overnight visits, has been Conquered Forever in a scientific approach to the problem * * * an approach Developed by A Doctor and Approved by Doctors. Over 100,000 Cases Corrected Now the bed wetting* habit can be stopped in 2 to 4 weeks Without Drugs or Attachments. Full Details will be sent to you Free of Charge or Obligation without embarrassment to the family or child.

*Functional" [15]

Another advertisement read:

"Give Your Child Carefree Happiness! Stop Bed Wetting

Without drugs, punishment, lasting harmful effects on your child's future and character. Save your child the unpleasantness, the embarrassment, the nervous tension caused by bed wetting. Enurtone, a tested method proved effective in thousands of cases. Enurtone, developed, endorsed and approved by doctors, is the modern, easy method of correcting this unpleasant habit. For Children and Adults Described in Redbook Magazine, Dec., 1951 Get Complete Details—No Obligation"

Language of the character used in this advertisement has been held to imply a "representation" of cure.[16] The other advertisements which are in the record recite emphatically:

"Stop bed-wetting." "Bed-wetting can be stopped." "Bed-wetting stopped."

In each, the words relating to "stopping" are emphasized in bold face so as to carry the representation that *all* bed-wetting can be stopped by the device. Words of this character have been held to imply that the remedy or device is.

15. Evidently to minimize the broad implications of the advertisement an asterisk is put in, which is repeated at the end, with the added word "functional". This does not correct the erroneous impression which the advertisement *as a whole* gives that the device cures *all* bed-wetting. Nor is this reference of a character that would convey to the prospective customer the impression that the effectiveness of the device is *limited* to functional bed-wetting. Advertising which has such tendency to deceive may be prohibited by the Commission, although there is lapse of time between the use of the advertisements or some have actually been discontinued. See, Bockenstette v. Federal Trade Commission, 10 Cir., 1943, 134 F.2d 369, 371; Philip R. Park, Inc. v. Federal Trade Commission, 9 Cir., 1943, 136 F.2d 428, 429; Drew & Co. v. Federal Trade Commission, 2 Cir., 1956, 235 F.2d 735, 740–741; Rothschild v. Federal Trade Commission, 7 Cir., 1952, 200 F.2d 39, 42–

43; Kalwajtys v. Federal Trade Commission, 7 Cir., 1956, 237 F.2d 654, 656, 65 A.L.R.2d 220.

16. "Use of the words 'for drunkenness' has been held equivalent to saying that the drug is a ' "cure, mitigation, treatment, or prevention" of drunkenness.' United States v. 11¼ Dozen Packages, D.C.W.D.N.Y.1941, 40 F.Supp. 208, 210. A representation that a medicine is 'for' or a 'treatment for' a disorder is equivalent to labeling it 'as a cure or remedy.' Hall v. United States, 5 Cir., 267 F. 795, 798. Labeling of mineral water as 'Recommended in the treatment' of diseases. can 'only mean that the use of the water in the treatment of the diseases named' would effect a cure or alleviation * *.' Bradley v. United States, 5 Cir., 264 F. 79, 81." Aronberg v. Federal Trade Commission, supra Note 5, 132 F.2d at page 168.

And see, Rhodes Pharmacal Co. v. Federal Trade Commission, 7 Cir., 1954, 208 F.2d 382, 386–387.

*a cure* for a named condition.[17] So it is quite evident that the material used to promote the device deliberately and assiduously promoted the idea that it was helpful in all cases of bed-wetting. Nowhere in the literature is there reference to the distinction recognized to exist between functional and organic bed-wetting,—a distinction which has already been referred to and which will be made clearer as we outline the testimony given by the medical experts who testified before the Commission.

In assaying the scope of a Commission Order of the character here involved, we must bear in mind the fact that the Commission, at all times, is conscious of the fact that these representations are not made to experts in the field, but to the laity who may not be capable of discerning their misleading character. The Supreme Court, in a noted case, has emphasized this fact:

> "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. *Laws are made to protect the trusting as well as the suspicious.*" [18]

### III

#### The Evidence in the Record

In considering the evidence in the record we advert to the fact that although the printed transcript covers only what might be called "the judgment roll", in determining the issue, we have considered and studied carefully the original typed transcript of the record before the Commission, consisting of some 717 typewritten pages, and the book of exhibits filed in the case of 100 or more pages, mostly photostatic. In what follows quotations will be made from this record.

As stated before, the issue before us, as limited by the modification we propose to introduce into the Order, is this:

Is there substantial evidence before the Commission to warrant the conclusion that the device was not effective in cases of enuresis caused by organic defects or diseases?

Four medical experts testified for the Commission. We refer to their testimony in the order given.

Dr. James L. Goebel is a physician specializing in urology and a diplomate of the American Board of Urology. At the time he gave his testimony he was clinical professor of surgery and chief of the Department of Pediatric Urology at Stanford University, California. After defining urology as a specialty of diagnosis and therapy of the urinary and genito-urinary tract, and enuresis as the medical term for bed-wetting, especially nocturnal—night bed-wetting, he stated that it was not a disease but a symptom, and

> "includes bedwetting in those humans at an age past which they should normally have stopped. This

---

17. "Also, the word 'Stop' carries with it an implication that the product is a remedy or cure and affords permanent relief.

"Another statement which we think is grossly exaggerated is 'For the itching of skin irritations such as rashes, hives, * * * D.D.D. Liquid, ordinary strength, is recommended as an effective and ideal remedy.' This language carries the implication that the product is a remedy or cure for the named conditions." D.D.D. Corp. v. Federal Trade Commission, supra Note 5, 125 F.2d at page 682.

See, Sebrone Co. v. Federal Trade Commission, 7 Cir., 1943, 135 F.2d 676, 679.

18. Federal Trade Commission v. Standard Education Society, 1937, 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141. The principle is stated very tersely in a case involving medical advertising by the Court of Appeals for the Seventh Circuit in this manner:

"The law is not made for experts but to protect the public,—that vast multitude which includes the ignorant, *the unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impression.*" Aronberg v. Federal Trade Commission, supra Note 5, 132 F.2d at page 167.

varies tremendously with the individual and may be as young as two or so and as late as eight or ten."

Because of this he described the procedure to follow when a patient is referred to him whose chief complaint is bed-wetting to be

"A careful investigation which includes a complete history of the symptoms and related symptoms; a complete physical examination is also effected. This may be sufficient to make a diagnosis of the cause for enuresis but, if it is not, and frequently is not, more information is obtained by getting laboratory studies, which include urinalyses, blood counts, X-rays, and if after this has been effected and a diagnosis or treatment—a diagnosis has not been made or treatment has not been initiated, or if it has been initiated it has not been successful, then more definitive investigations such as cystoscopy are instituted."

These steps are necessary in order

"to find the cause for the symptom and prevent a misdiagnosis and delayed diagnosis, thereby possibly causing damage to the individual in your charge."

He designated the categories or types of enuresis as

"organic and functional, and mature or immature enuresis, rather."

Maturation, he defined as

"a normal function, * * * a normal growth and development of the child, and maturation in all organs and systems varies with the individual, and, as I stated before, sometimes in sex. Maturation in relation to enuresis has to do with the normal ability for that child to prevent urinating in bed without his knowledge, and this depends upon his ancestry and his health and his growth and development."

Based on his own experience as a urologist, he placed the incidence of organic enuresis at seventy per cent. As to the causes of organic enuresis he stated that

"they vary from minor inflammatory processes, from the meatus of the male to severe stenoses, which are narrowings or contractures of the bladder neck, and infections of the genito-urinary system, tumors, anomalies. Anomalies of the urinary tract include changes in the normal structure of the urethra and of the meatus and of the prostatic portion of the urethra, valves of the urethra. Irregular positions of the ureters, anamalous openings of the ureters into the genito-urinary tract, are anomalies. There are many others."

He added that the treatment given depends on correct diagnosis and that if there are infections they must be cleared up. He continued:

"If there are scarred orifices or narrowed channels, they must be enlarged, sometimes by simple stretching methods and sometimes it requires surgical intervention, and these again vary with the disease entity. Some require short surgical procedures and others require long ones, some evolving in hospitalization for long periods of time with open surgical intervention."

These methods result in improvement, but many cases are never cured.

As to functional enuresis, he stated:

"They vary from habit all the way to severely disturbed children and families that are in dire need of psychiatric guidance and so on. But those that are simple and those that are habit primarily, I discuss frankly with the patient and the patient's parents the problem involved, and give them medications to help them and encourage them. I also instruct them on that they are unacceptable in public life and they have no more right to wet the bed than I do. The simpler ones are cleared and the more complicated ones require reference to someone specializing in that field."

Those in the maturation group, in his view, *are easy to cure.* After seeing the device demonstrated, Dr. Goebel stated that it could not cure organic enuresis. He added, however:

"It could influence the action of functional enuresis and this influence could be toward improvement or vice versa, *to make it even worse.* It will not mature a child, but it could be operating at a time that the child would naturally stop if some influences were placed, *such as a kick in the fanny,* or a pleasure trip to the Sierras promised, or an alarm clock ringing to awaken them to do the same sort of thing. I doubt seriously that this would cure a seriously enuretic child. Certainly it will have no influence on infection. It might even and could well, as I see it, make a disease worse and possibly even go on to cause irreparable damage and shortening of the individual's life." (Emphasis added.)

As to the effect of the use of the device in cases of emotional enuresis his view was

*"that it is possible to have some beneficial effect but it is also possible to have a detrimental effect."* (Emphasis added.)

The Commission's second medical expert was Dr. Moses Grossman, a pediatrician and assistant professor of pediatrics at the University of California School of Medicine, in charge of the Pediatric Out-patient Clinic, at San Francisco. He too described enuresis as a symptom, the treatment of which requires a complete study of its causes in order to determine whether organic diseases exist, such as

"the presence of urinary infection, pin worms, diabetes mellitus or insipidus diabetes, or some other kind of disease that might be responsible for his bedwetting."

He divided enuresis into three categories:

"Enuresis due to organic causes, some of which I have just mentioned,

and enuresis due to an emotional disturbance and, finally, enuresis which is simply due to slow maturation of the child."

He placed the functional causes, including maturation, at eighty-five per cent of the cases of enuresis. As to the device, with which he was familiar by reputation and which he saw demonstrated in the courtroom, he stated that it *would not be* of any assistance in organic cases. The questions and answers are given here:

"Q. Doctor, what is your opinion as to whether this Enurtone device is or would be effective in stopping bedwetting or correcting bedwetting, or removing the causes of bedwetting? A. I think it is very unlikely that it would be of much help in organic cases. I think it is quite possible that it would be of help in cases that are of late maturation, and as to whether it would be of help in emotional cases, I think it is more likely than in organic, and less likely in maturation cases.

"Q. Now, with respect to emotional cases, would it depend upon whether the emotional disturbance is mild or serious?

\* \* \* \* \* \*

"The Witness: I think the more serious the disturbance, the less apt it is to help.

"By Mr. McNally:
"Q. What is the basis of your opinion, or the reason for your opinion? A. The reason for my opinion is familiarity with patients with enuresis, and familiarity with how they respond to treatment."

The Commission's third medical expert was Dr. Kent A. Zimmerman, a psychiatrist, Director of the Child Guidance Section at Children's Hospital of the East Bay, Oakland, California, and lecturer in pediatrics at University of California Medical School, whose specialization included enuresis. When he testified he was practicing what is called "child psy-

chiatry" but he also practiced adult psychiatry.

According to his testimony, the problem of urinary control falls within the area of his specialization as does also the diagnosis and treatment of enuresis. He agreed with the other medical experts that enuresis is a symptom, and that its presence requires medical tests to eliminate organic cases such as

"congenital malformations or infections of the urinary tract * * *"

He also agreed with the other medical experts that in order to determine the cause of the disease a thorough examination by a competent medical authority is necessary. As to the categories of enuresis, his statement was:

"The way I consider the problem of enuresis is that there are organic bases for enuresis which I have already defined as consisting of malformations of the urinary tract or chronic infections. Then there is a group of patients who fall within what I call maturational causes of enuresis. This has to do with the growth and the integration physiology, and the anatomical performance of the urinary tract and its tie-up with the brain. The third group of causes of enuresis is those that are on an emotional basis primarily, reflective usually of emotional problems within the family as a whole. There is a relationship between the child and the parents."

According to him, examinations and laboratory tests together with facts and the history of the behavior of the urinary tract are necessary to determine the cause. As to the more specific causes of the organic enuresis he stated, on cross-examination:

"Under the organic causes of which I know enuresis can be a symptom are such things as congenital malformations of the urinary tract, with all its variations, insofar as they affect the kidney, the ureters, the bladder and the urethra. Disturbances of metabolism of various kinds may cause enuresis. These are sometimes inborn or congenital, such as sometimes malformation of the pituitary, the posterior pituitary glands which also will cause enuresis day and night.

"These are other kinds of metabolic disorders which will cause enuresis, such as diabetes. Then you have rarer causes of this with various difficulties in other areas of metabolism with relation to sugars in the body as well as amino acids and so forth. Infections of the central nervous system as well as infections of the urinary tract can cause enuresis, or the results of such infections."

As to the effectiveness of the Enurtone device, the operation of which he understood, his answer was:

"I do not believe it would be effective in stopping bedwetting that occurs on an organic basis. I think it would be effective in some cases of maturationally caused enuresis, especially as it would coincide with the period when the child would be reaching more toward the control, development of the control of his bladder, day and night.

"It could cause the stoppage of enuresis for certain periods in the severe emotional group, the severely emotional problems of the family, but I do not believe this would be permanent. My experience in some cases shows that relapses are fairly common where the instrument has been used."

Asked for the basis or the reason for his opinions, he said:

"Insofar as the organic causes of enuresis are concerned, *I do not see that this device has any basis in physiology or disturbed physiology or anatomy of the urinary functioning, which would influence that in any way.*

"*Insofar as the effectiveness with maturational determined enuresis, I think that when it is useful here it can become a device around which the child feels he can speed his process along and I think the family*

*also certainly might feel that this would be a help and it would be something that they could use at that time.*

"I think, again I say that I think this is coincidental in the sense that the child is already working toward or will develop toward the control of his bladder and the machine will therefore seem to be and is a help, I think, at this particular time in those cases.

*"Insofar as my opinion as to the emotional, where it is not effective in the emotional situation, family with severe emotional problems of which the enuresis is one symptom, this machine tends not really to influence the basic causes of emotional growth, problems within the family. That is, in a permanent enough way for the enuresis to disappear."* (Emphasis added.)

The last medical expert of the Commission was Dr. Bradford Young, urologist, diplomate of the Board of Urology and former instructor at the Stanford University Hospital, who specializes in diagnosis and treatment of enuresis, practicing urology in San Francisco. Like the others he testified that a determination of the symptom requires careful histories, physical examination, laboratory studies, X-rays and, at times, cystoscopy.

Like the others he differentiated between functional and organic and traced some fifty per cent of the cases to organic causes. He was familiar with the device and had seen it demonstrated. Asked to give his opinion as to its effectiveness, he stated that it would be wholly ineffective:

"Q. What is your opinion, Doctor, as to whether or not this Enurtone device could be effective in stopping bedwetting or could be effective in correcting the bedwetting habit or removing the causes of bedwetting? A. I don't think it will be effective.

"Q. With respect to any particular types of enuresis, would you care to break down your answer? A. When I gave that answer I was thinking of the functional type. *It certainly would be of no value in organic disease because in the presence of cystitis the bladder is so irritable in a small child they have no real way of controlling it.* Even adults have trouble with acute infection, walking down the street. In the group of maturing children between the age of two and four, of course, it would be of no value because the nervous system isn't really set up to be able to respond to a device like that.

"In the functional, *purely functional causes of enuresis, I think about all it would do would be to keep the sheets a little dry. As far as treating the enuresis in the child, I do not think it has any value, the cause of enuresis.*

"Q. I did not ask you, what is the reason for your opinion? A. The reason is that a device such as this actually, in my mind, as far as what I understand or feel the situation of enuresis consists of, is sort of an after-the-fact kind of a machine. *The child has already wet the bed. The bell then goes off and then this involves drying the pad and getting the sheets off, and I don't think this approach is the basic problem in enuresis, which is why the bladder should get full and empty without waking the child up. It does not seem to approach the causes of enuresis."* (Emphasis added.)

On cross-examination he was more specific as to what he considered the possible bad effect of the use of the device. We quote from the record:

"Q. I think you stated on your direct examination that in giving the reasons for your opinion, that one of the reasons why you questioned the efficacy of this device is that the urination has already occurred at the time the device is activated. Was that your statement? A. Yes.

"Q. This is based, is it, on the premise that there is a complete voiding of the bladder? A. No, not necessarily. It is based on the premise that if there is—presumably, this intends to work on a conditioned response of one kind or another, but it is a very poorly controlled conditioned response inasmuch as you never know what is your conditioning. You do not know if you are conditioning him to be wet, which is what happens when they wake up with the bell going off, they are damp, you might be conditioning this, for all I know. I don't know how well you can control, what you can actually say about the conditioned response, how you can say that this conditions this response. You could be conditioning him to the light going on; maybe, everytime that the bell went off; you would urinate when you got to be forty years old. How do you know.

\* \* \* \* \* \*

"Q. Would it be any different to you or would it make any difference to you if the quantity, amount of urination which was emitted by the sleeper prior to the time that he is awakened is less than a full voiding of the bladder? A. No, I don't think it would, because the voiding response has already started. They have had the sensation of stress, the voiding. We have used the words 'the first drop of urine on the pad today. In urology there is no such thing, really, as a 'first drop of urine'. It is the first great squirt of urine, as a rule. I would think that in order to get urine on here that you would have to be fairly wet all over."

Pressed for more specific explanation, on cross-examination, he said:

"Q. Now, you say that you think the Enurtone device is like the parent staying there with the child at night and saying the same thing, in effect, that the parent says during the day, when he says, 'Johnny, go to the bathroom.' Is that correct? A. Yes.

"Q. *Do you think the effect is any more or less adverse than the mother who says to Johnny during the day, 'Johnny, go to the bathroom? A. I think it is a little more adverse on account of the bell. That is a frightening thing to have go off in the middle of the night when you are sound asleep. It is hitting the nervous system that is completely relaxed with not much cortical function to protect itself. This hits you right smack in the middle of your subconscious level with a good loud noise and lights going on, and I think it has a potent effect. I don't think there is any question about it, but I think it is an effect for ill rather than for good.*" (Emphasis added.)

■ So we have two urologists, a pediatrician and a psychiatrist,—within whose specializations urinary incontinence of every kind falls,—agreeing that organic enuresis, *which is of frequent incidence, requires expert medical diagnosis and treatment*. They do not agree on the degree of incidence of organic as distinguished from functional enuresis. However, they are in complete accord that the device cannot be of assistance in organic enuresis, *which they think*, in varying degrees, *is frequent*.[19]

In the petitioners' argument much is made of the fact that the medical ex-

19. The exact proportion of organic cases, whether, as testified to by the experts for the Commission, they range from twenty-five to fifty per cent of the cases of enuresis or the two or three per cent contended to by the petitioners' experts, is not important. The Commission has a right to issue cease and desist orders if the representations as to the device are likely to mislead an appreciable or measurable segment of the public. See, Goodman v. Federal Trade Commission, supra Note 4, 244 F.2d at page 602. And see, Consumer Sales Corp. v. Federal Trade Commission, 2 Cir., 1952, 198 F.2d 404, 407.

perts produced by the Commission had little knowledge of the device, knew it only by reputation, or had only seen it demonstrated at the trial. The answer is that given by this Court in a similar case where objection was voiced that experts were allowed to testify as to the efficacy of a medical preparation which they *had never prescribed* or the effect of which *they had not observed* in concrete cases:

> "The witnesses were shown to possess wide knowledge in the field under inquiry. There is no good reason to suppose them incompetent to express an opinion as to the lack of therapeutic value of petitioner's preparation merely because they had had no personal experience with it in the treatment of the disease. *Their general medical and pharmacological knowledge qualified them to testify.*" [20] (Emphasis added.)

The experts were subjected to rigorous cross-examination which, at times, ranged over the entire field of medicine, the frequency of cures in other diseases, and the proverbial hesitancy of the medical profession to *approve or adopt new methods or devices.* On the basis of this, it is argued that there are contradictions in the testimony. After examining the entire record, we feel that, as to the essential issues before the Commission and now before the Court, there was no contradiction in their testimony or such *improbabilities in it as would call for its rejection.* Indeed, the quoted portions of the cross-examination of two of the medi-

cal experts indicate that the cross-examination helped emphasize the reasons why, in their opinion, the device was not and could not be effective in cases of organic enuresis. If there was contradiction or conflict, it was a question of fact for the Commission to resolve.[21]

The Commission by its findings and order also resolved any contradiction of the Commission's medical experts, by the inventor of the device and a general practitioner of medicine whom the petitioner produced, and the testimony as to the number of devices leased, some 5,000, and the testimonials of satisfied users.[22] As said by the Court of Appeals for the Seventh Circuit in a case already cited:

> "*True, the Commission's evidence was zealously controverted by petitioner. But the triers of the facts were in a position to weigh the testimony and the credibility of the witnesses.*" [23] (Emphasis added.)

However, Dr. H. Wright Seiger of Santa Monica, California, the inventor and owner of the patents, admitted that if enuresis, in which he had been interested since 1934, is caused by pathology medical care is necessary. We quote from the record:

> "Q. In the instance of a pathological condition that exists at the same time with the bed-wetting, and there are no other symptoms that are easily ascertainable, would it take a doctor to determine whether further urological examination is necessary or other proceedings to check out as

---

20. John J. Fulton Co. v. Federal Trade Commission, supra Note 5, 130 F.2d 85–86. In Justin Haynes & Co. v. Federal Trade Commission, supra Note 5, 105 F.2d 988–989, the Court of Appeals for the Second Circuit said of a sim'lar situation:
"It is true that these witnesses had no personal experience with Aspirub and based their opinions upon their general medical and pharmacological knowledge. They were, however, well-qualified expert witnesses, and the fact that other experts called by the petitioner expressed a contrary opinion and testified to experiments cannot enable the petitioner to contend

successfully that there was no substantial evidence to support the Commission's findings."
And see, Neff v. Federal Trade Commission, supra Note 5; Dr. W. B. Caldwell, Inc. v. Federal Trade Commission, supra Note 5; Alberty v. Federal Trade Commission, 9 Cir., 1941, 118 F.2d 669, 670; Koch v. Federal Trade Commission, supra Note 12, 206 F.2d 315–316.

21. See cases cited in Note 5.

22. See cases cited in Note 19.

23. Aronberg v. Federal Trade Commission, supra [132 F.2d 170] Note 5.

to the cause of the Enuresis? A. A simple examination would not disclose that; a urological examination would.

"Q. How about a cystoscopy? A. That would only show cystitis; that would not show a tumor."

As to the effectiveness of the device in pathological cases, his answers may be taken as an admission that the device *does not* correct these conditions, coupled with the assertion that *no such claim* is made for the device. We quote from the record:

"Q. Now, of course, Dr. Seiger, *the device does not correct the pathology.* A. No. * * *

"Q. *And it is not purported to be a device for use in correcting pathology.* * * * A. *Yes, it is not.* May I add something to that?

"Mr. Easton: Yes. A. Where there is an anxiety between the mother and the child, that anxiety will frequently disappear of itself when the Enuresis is cured."

Dr. Louis I. Sokol, a physician engaged in the practice of internal medicine at Los Angeles, California, denied that pathological causes existed for enuresis or that it is symptomatic of it. However, he conceded that in the literature on the subject there is a recognized distinction between functional and organic enuresis. We quote from the record:

"Q. Well, is there more than one kind of enuresis? A. You mean nocturnal and diurnal?

"Q. Well, you can state that if you regard that as a classification, or whether there is anything as so-called organic enuresis or functional enuresis. A. Well, enuresis—the term means bed-wetting.

"Q. Yes. A. And we assume by the term itself, bed-wetting, that occurs primarily at night; however, we know there is such a thing as bed-wetting that can occur during the course of the day. The literature divides the term * * *.

* * * * * *

"The Witness: *As a medical term, we can divide the term into so-called diurnal or functional enuresis.*

* * * * * *

"The Witness: *Functional enuresis would be that which occurs on a functional basis or poor toilet training, for which there is no pathological reason.*

"By Mr. Easton:

"Q. And would you define for us the so-called organic enuresis? A. This would be bed-wetting which would occur in which there would be present an organic or pathological enuresis.

"Q. Doctor, can you state whether certain pathological conditions are sometimes attributed to the cause of bed-wetting?

* * * * * *

"A. Yes, *there are a great many pathological conditions present in the genito-urinary tract which are attributed as the etiological factor in bed-wetting.*

"Q. And can you name some of these pathological conditions which are sometimes attributed to the cause of bed-wetting? A. Any urinary infection of the bladder or the kidneys, a trigonitis, which is an inflammation of the bladder, polyps, tumors, strictures, bladder neck obstructions and enlarged prostate gland, other enlarged organs in the region of the bladder which might cause pressure, tuberculosis, and other conditions whereby the kidneys or the bladder could be affected which could be an extra genito-urinary condition, such as pathology within the spine or pathology within the spinal cord, spastic paraplegia, many, many others." (Emphasis added.)

While stating that the incidence of pathological causes of enuresis would only amount to two to five per cent of the cases, he gave these specific answers to questions relating to the device:

"Q. And from your experience, take persons from the ages of three and one-half to five, would you say whether those persons could be corrected in their bed-wetting by the use of the Enurtone device? A. As I understand the question in my experience as a physician, do I understand these individuals above the age of three and one-half to five years of age, if they persist in bed-wetting at night, could they be trained?

"Q. Yes. A. Yes.

"Q. And do you think this Enurtone device would accomplish that training? A. I do.

"Q. And do you think the Enurtone device could train a person with bladder control in the same manner as a person who also has one or more of the pathological conditions which we have talked about? A. I do because I personally feel that these pathological conditions are not the cause of enuresis.

"Q. *We recognize, of course, Doctor, that the Enurtone device does not correct the pathology. You understand I am not in any of my questions suggesting or asking whether the Enurtone device corrects the pathology.* I can see you do not. A. *That is right.*

"Q. *But it will correct bed-wetting whether the pathology persists or is independently corrected.* A. *That is right.*"

These statements could well be taken as lending strength to the opinions expressed by the experts for the Commission that the device would not help in organic cases.

Indeed, counsel for the petitioners referred to some of these statements as a basis for what may be called "a conditional admission" that the device does not correct any pathology and is not so held out.[24] Granted, however, that the witnesses produced by the petitioners contradicted the Commission's experts, as did also the testimonials of satisfied users offered by the petitioners, the conflict was for the Commission to resolve. And they having accepted the views of the Commission's experts that the device was of no assistance in cases of organic enuresis, the requirement as to proof is amply met and the order, as proposed to be modified by the Court, is supported

---

24. An admission that the device *does not* correct pathology is also contained in the following excerpts from the petitioners' opening brief:

"By way of sharpening the question, it should be pointed out that it is not contended that the device corrects the pathology [Tr. p. 532, lines 19–23; p. 618, lines 6–8; p. 618, line 23, to p. 619, line 10] and the device is not recommended where there are organic disorders [Tr. p. 570, lines 15–23]. * * * (p. 17)

"The Enurtone device does not correct any pathology which may exist and is not so held out." (p. 44)

The transcript references are to the testimony of the petitioners' experts, which is already reproduced and commented on in the text of this opinion (Part III). While the admission is conditioned by the statement that the device is not so held out, we are justified in concluding that the advertisements, some of which we have analyzed, (Part II, Subd. B) conveyed a different impression. This warrants the determination that the representations as to the efficacy of the device should state positively that they are not of any assistance in organic cases, as proposed in the modified order. It should be added that the existing patent issued on June 30, 1953, is strictly a device patent and makes no claim as to *efficacy* in controlling enuresis. The most important Claim reads:

"1. A urine controlled signal device of the kind set forth and including an insulative, water-proof bed pad, of flexible material, and a plurality of units each of elongated, oblong form in plan; each unit consisting of a pair of comblike electrodes with their teeth intermeshed and the elongate backbone portion of the combs of the units being parallel in adjacent units and spaced to provide flexibility of the pad and reduce hazardous flexure of the teeth of the combs and in close proximity."

In addition to the prior Seiger patent, No. 2,127,538, issued on August 23, 1938, the Patent Office cites a patent to Homan, No. 1,384,467, issued July 12, 1921. So evidently the art is old.

by substantial evidence on the record as a whole, and is not arbitrary or capricious.[25]

IV

### The Validity of the Order and the Alternative Contention

It is the contention of the petitioners that if there be substantial evidence to sustain the order of the Commission, its form exceeds the power of the Commission and that it is, therefore, illegal and void. It is suggested that if the order is not set aside the situation be remedied by substituting for the order of the Commission the initial decision of the Hearing Examiner dated February 24, 1959. As already appears, the Commission's order as it is proposed to be modified, would direct that any promotional material issued in the future limit the effectiveness of the device to enuresis not caused by organic defects of disease. The initial decision as worded would not achieve this result, as will be shown further on in the opinion. We now outline the power of the Commission to issue orders of the type here involved.

#### A. Variety of Deceit

■ The argument that an order of this character exceeds the power of the Commission overlooks entirely the power of the Commission under Section 5 of the Federal Trade Commission Act, under which this proceeding was instituted, and which, after declaring unlawful unfair methods of competition and unfair or deceptive acts or practices in commerce, directs and empowers the Commission to prevent the use of such methods or acts.[26] The power is extensive.

Actual deception is not necessary. Whether good or bad faith exists is not material, if the Commission finds that there is likelihood to deceive.[27] Of the scope of the power under this Section the Supreme Court has said:

"Orders of the Federal Trade Commission are not intended to impose criminal punishment or exact compensatory damages for past acts, but to prevent illegal practices in the future. In carrying out this function the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity. Moreover, '[t]he Commission has wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices' disclosed." [28]

A well known writer has stated the variety of deceit that the skillful advertiser can use in this manner:

"The skillful advertiser can mislead the consumer without misstating a single fact. The shrewd use of exaggeration, innuendo, ambiguity and half-truth is more efficacious from the advertiser's standpoint than factual assertions. Facts are dull and dangerous; exaggerations are vivid, attractive and privileged. * * *

---

25. 5 U.S.C.A. § 1009(e) (1) and (5).

26. 15 U.S.C.A. § 45.

27. See cases cited in Note 15. Goodman v. Federal Trade Commission, supra Note 4, 244 F.2d at page 602.

"The fact that petitioners made the representations in good faith is immaterial. *Decision whether material facts have been misrepresented does not depend upon the good or bad faith of the advertiser. * * * And the mere fact that*

*words and sentences may be literally and technically true does not prevent their being framed so as to mislead or deceive."* Koch v. Federal Trade Commission, supra Note 12, 206 F.2d at page 317. (Emphasis added)

See, Charles of the Ritz Distributors Corporation v. Federal Trade Commission, 2 Cir., 1941, 143 F.2d 676.

28. Federal Trade Commission v. Ruberoid Co., 1952, 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081.

*"Any exemption of puffs or opinion is especially serious in the field of drug advertising, which consists in large measure of therapeutic claims."*[29] (Emphasis added)

### B. Devising Means of Enforcement

In applying these principles the courts have, ever since the enactment of the Federal Trade Commission Act, sustained orders which sought to limit the use of language which, although seemingly innocuous to the expert was likely to deceive the unlearned and gullible. To cope with the great variety of deceit they have devised varied means of combatting them. They have ordered additions or omissions of words, phrases or statements, or disclosures, positive or negative, as the circumstances of the situation demanded. And the courts, without deviation, on review, have sustained them. A few illustrations may be given.

The Supreme Court has sustained an order of the Commission which prohibited a flour company from using the word "milling" in its name because the word was understood by dealers and the public to indicate concerns grinding wheat and flour, which the particular company did not do.[30]

This Court has sustained an order of the Commission which prohibited a concern from claiming that certain food blends and pellets have "therapeutic or medicinal value".[31]

The Court of Appeals for the Seventh Circuit has sustained an order which forbade a pharmaceutical company to claim that a preparation "stopped" itching. Significantly, the court held that the order was sustained by substantial evidence, although the acts of the defendant were not deemed fraudulent, saying:

"It must be kept in mind that the false, unfair or deceptive acts defined in the Federal Trade Commission Act *need not be such as would constitute fraud as that term is ordinarily understood in law.*"[32] (Emphasis added)

This Court has sustained an order which forbade representing a product known as "Uvursin" as effective treatment for diabetes.[33]

In another case this Court prohibited the use of the words "MD Medicated Douche Powder" because the purchasers might receive the impression that the product had medical approval. The Court saw in the use of the symbol "MD"

"the conscious attempt—to capitalize upon the prestige of a profession that, for all its blunders and ineptitudes, from the very days of Hipprocrates and Galen has built up a noble tradition of self-sacrifice and service to humanity."[34]

This Court has prohibited the use of the word "Hollywood" with the legend "favorite of the Stars" in conjunction with the promotion of a cosmetic, on the ground that it gave the impression that it was a product of the motion picture colony and was preferred by motion picture stars.[35]

29. Milton Handler, "The Control of False Advertising Under the Wheeler-Lea Act", 1939, 6 Law and Contemp.Prob. 91, 99–100.

30. Federal Trade Commission v. Royal Milling Co., 1953, 288 U.S. 212, 216–217, 53 S.Ct. 335, 77 L.Ed. 706.

31. Alberty v. Federal Trade Commission, supra [118 F.2d 670] Note 20. Similarly the Court of Appeals for the Second Circuit has sustained an order of the Commission which prohibited the use of the trade-name "Aspirub" and representations as to the beneficial effect of the aspirin used in the compound of such name. Justin Haynes & Co. v. Federal Trade Commission, supra Note 5, 105 F. 2d at page 988.

32. D.D.D. Corporation v. Federal Trade Commission, supra Note 5, 125 F.2d at page 682.

33. John J. Fulton Co. v. Federal Trade Commission, supra Note 5.

34. Stanley Laboratories v. Federal Trade Commission, 9 Cir., 1943, 138 F.2d 388, 393.

35. Howe v. Federal Trade Commission, 9 Cir., 1945, 148 F.2d 561, 562.

The Court of Appeals for the Second Circuit sustained an order prohibiting the use of the word "rejuvenescence" in a cosmetic preparation.[36]

In a later case this Court upheld an order which, among other things, required a weaving concern to confine their representation as to a course they taught "to the overweaving or patch type of reweaving".[37] This because "reweaving" had a special meaning in the particular trade and the petitioner *did not teach* it in its course.

In a more recent case the Court of Appeals for the Seventh Circuit sustained an order which prohibited a person who held himself out as a "trichologist" from representing that a certain preparation sold by him would prevent or overcome baldness or permanently eliminate dandruff, irritation or itching of the scalp.[38]

In one of the latest cases on the subject, this Court sustained an order of the Commission commanding a manufacturer to desist from claiming certain curative effects for laxative pills.[39]

These and other cases that could be cited illustrate the wide scope of orders which the courts have sustained in proceedings to review orders of the Commission. They warrant the conclusion that the order made in the case before us was not in excess of the power of the Commission to make.

### C. Petitioners' Attempt to Delimit the Means

The contention to the contrary is based upon certain language contained in a case from the United States Court of Appeals for the District of Columbia.[40] The Court there had before it a cease and desist order which required the petitioner, engaged in selling food and drug products, to desist from making certain representations. One of the clauses of the order, which the Court held beyond the power of the Commission to make, required that the advertisements state

"that the condition of lassitude is caused less frequently by simple iron deficiency anemia than by other causes and that in such cases this

---

36. Significantly, the Court said:

"There is no merit to petitioner's argument that, since no straight-thinking person could believe that its cream would actually rejuvenate, there could be no deception. Such a view results from a grave misconception of the purposes of the Federal Trade Commission Act. That law was not 'made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous.' Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73, 75; and the 'fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.' * * * And, *while the wise and the worldly may well realize the falsity of any representations that the present product can roll back the years, there remains 'that vast multitude' of others who, like Ponce de Leon, still seek a perpetual fountain of youth.* * * * It is for this reason that the Commission may 'insist upon the most literal truthfulness' in advertisements,

Moretrench Corp. v. Federal Trade Commission, 2 Cir., 127 F.2d 792, 795, and should have the discretion, undisturbed by the courts, to insist if it chooses 'upon a form of advertising clear enough so that, in the words of the prophet Isaiah, "wayfaring men, though fools, shall not err therein." ' " Charles of the Ritz Distributors Corporation v. Federal Trade Commission, supra Note 27, 143 F.2d at pages 679–680.

37. Goodman v. Federal Trade Commission, supra Note 4, 244 F.2d at page 597.

38. Erickson v. Federal Trade Commission, supra Note 5, 272 F.2d at page 318. A similar ruling was made by the Court of Appeals for the Fifth Circuit under somewhat similar circumstances. See, Keele Hair & Scalp Specialists, Inc. v. Federal Trade Commission, supra Note 5, 275 F.2d at pages 21–23.

39. Carter Products, Inc. v. Federal Trade Commission, supra Note 4, 268 F.2d at page 461.

40. Alberty v. Federal Trade Commission, 1950, 86 U.S.App.D.C. 238, 182 F.2d 36.

preparation will not be effective in relieving or correcting it." [41]

The other was a requirement that the advertisements state that the claims of curative value made for one of the products were made

"under the principles of the homeopathic school of medicine." [42]

The majority opinion, after stating that the task assigned to the Commission by the Congress is "specific", outlines the scope of the Commission's powers, as exercised in the case before them, in this manner:

"Such power seems to us to be no less than the power to control the marketing of all such products, because, if particular advertisers, selected by the Commission, can be required not only to state accurately the limited benefits of their products but also to call attention to what the products will not do, the effect on marketing is clear enough. Such a requirement seems to us to have no relation to the prevention of falsity in advertising. It is a wholly different power.

"Our dissenting judge says that 'The Act's purpose is to encourage the informative function of advertising.' That view reflects clearly the difference between us. We think that neither the purpose nor the terms of the act are so broad as the encouragement of the informative function. Both purpose and terms are to prevent falsity and fraud, a negative restriction. When the Commission goes beyond that purpose and enters upon the affirmative task of encouraging advertising which it deems properly informative, it exceeds its authority." [43]

These declarations should be confined to the matters before the Court. While, in the notes to the opinion, both Sections 5 and 12 of the Federal Trade Commission Act were cited, it is quite evident that the proceedings were under Section 12 of the Act. The majority opinion so states:

"They (the petitioners) were charged by the Commission with disseminating false advertisements amounting to unfair and deceptive acts or practices in commerce." [44]

This is a direct reference to Section 12 of the Act, which declares the dissemination of false advertisements in commerce to be an unfair or deceptive act or practice. And the court, in one of the passages already quoted, gave its views as to the type of "false advertising" so prohibited. It is evident, therefore, that the problem before the Court was narrower than in the case before us. Our case, instituted under the more comprehensive provisions of Section 5 of the Act, called for an order requiring disclosure of "informative" facts in the interest of truth. These considerations differentiate that case from the present one. But there are others.

The ground of decision, at least as to one of the objectionable clauses of the order before the Court, was the failure of the Commission to make a finding to support it. The opinion states:

"The Commission must find either of two things before it can require the affirmative clause complained of: (1) that failure to make such statement is misleading because of the consequences from the use of the product, or (2) that failure to make such statement is misleading because of the things claimed in the advertisement. There is no such finding here."[45]

The Court of Appeals for the Fifth Circuit, in distinguishing the case and in declining to follow it, stated that the

41. Alberty v. Federal Trade Commission, supra Note 40, 182 F.2d at page 37.

42. Alberty v. Federal Trade Commission, supra Note 40, 182 F.2d at page 40.

43. Alberty v. Federal Trade Commission, supra Note 40, 182 F.2d at pages 38–39.

44. Alberty v. Federal Trade Commission, supra Note 40, 182 F.2d at page 37.

45. Alberty v. Federal Trade Commission, supra Note 40, 182 F.2d at page 39.

failure to make the proper finding was *the real ground of decision:*

"There is nothing in the Alberty case that prevents enforcement of a cease and desist order requiring affirmative disclosure. *The Alberty case simply held that the Commission must make certain findings before compelling affirmative disclosure.* In the instant case the Commission made the required findings and on the basis of these findings issued its order requiring that the petitioners disclose affirmatively that Keele preparation would not be effective against male pattern baldness." [46] (Emphasis added)

But the problem before us is entirely different. For here the Commission found, as a fact, as did the Examiner, that the device was advertised as curing *all* bed-wetting. The Examiner stated as a conclusion:

"1. The use by the respondents and their lessees of the representations hereinabove described, containing materially misleading statements and representations as to the effectiveness of respondents' device when used in connection with organic enuresis, has had and now has the tendency and capacity to mislead substantial numbers of the public into the erroneous belief that such statements and representations are true and to induce a substantial number of the members of the public to lease respondents' device because of such erroneous beliefs."

While disapproving the form of the Examiner's initial order, the Commission agrees that the advertisements were misleading and that public interest requires that they be limited. We quote from the opinion:

"The respondents in mistaken self confidence represented in their advertising that they had the problem whipped. It is our conclusion, based on the record before us, that they did 'but strut in pride and vaunt their empty claims.'

" * * * The public interest plainly requires that such claims or promises for helping enuretics as may be used in respondents' future promotional matter be limited to cases of enuresis for which benefits reasonably may be expected to be afforded."

The requirement that future advertisements state positively that the device does not help in enuresis caused by organic defects or disease does not involve the statement or disclosure of an unrelated negative fact. It seeks to avoid the misleading effect of the claim that the device cures "bed-wetting", without qualification, i. e., all bed-wetting, which, as the Examiner and the Commission found, the advertisements and brochures trumpeted. Such limitation, as the preceding shows, is in line with similar orders which courts, including this court, have sustained, and which gave recognition to the fact that the Commission

"is clothed with wide discretion in determining the type of order that is necessary to bring an end to the unfair practices found to exist." [47]

Some of the general expressions in the opinion of the Court of Appeals

---

46. Keele Hair & Scalp Specialists, Inc. v. Federal Trade Commission, supra Note 5, 275 F.2d at page 23.

47. Federal Trade Commission v. National Lead Co., 1957, 352 U.S. 419, 428, 77 S.Ct. 502, 509, 1 L.Ed.2d 438. In commenting on this statement this Court has stated:

"The Commission is the expert body to determine *what remedy* is necessary to eliminate the unfair and deceptive practices disclosed by the record, and it has wide latitude for judgment. Shaping a remedy is essentially an administrative function. Congress has entrusted the Commission with the responsibility of selecting *the means* of achieving a statutory policy—the relation of remedy to policy is peculiarly a matter for administrative competence." Carter Products, Inc. v. Federal Trade Commission, supra Note 4, 268 F.2d 498. (Emphasis Court's)

And see, Federal Trade Commission v. Mandel Bros., Inc., 1959, 359 U.S. 385, 392, 79 S.Ct. 818, 3 L.Ed.2d 893.

for the District of Columbia, which would limit the power of the Commission to control advertising and representations that mislead, by the insertion of specific limitations, positive or negative, or by requiring disclosures, are contrary to the views just expressed and to the letter and spirit of the decisions analyzed. And being general in nature are not binding in this litigation.[48] We need not and do not choose to follow them.

### Summary and Conclusion

From the preceding discussion it is evident that the order involved in this case is sustained by substantial evidence in the record, considered as a whole, and is within the power of the Commission to make. The crux of the problem is the fact that the device under consideration is of no benefit in cases of enuresis caused by organic defects or diseases. The petitioners, and their lessees, by continually representing, over a course of years, that the device benefited "bed-wetting", without qualification, deliberately conveyed the idea that it is effective in *all* cases of enuresis.

In the light of the discussion which precedes these are clearly unfair methods of competition and unfair and deceptive acts or practices in commerce which the Commission is commanded, by the Statute, to prevent.[49]

As already indicated (Part II, Subd. A), this result can be best effected by modifying the order of the Commission by inserting the word "caused" in the main clause of the order. To restore the order to the form in which it was recommended by the Examiner in the initial order, *as the petitioners request us to do,* would not achieve the desired result. That order, as already appears, would have commanded the petitioner to cease and desist from representing

> "That the use of such device is of value in stopping bed-wetting or in correcting the bed-wetting habit in

cases of enuresis involving organic defect or diseases."

Because this order *did not* require a positive declaration that the device was of no assistance in cases of bed-wetting caused by organic defects, it would not achieve the result sought to be attained by the Commission, namely, to stop the representation by the petitioners that the device *is a cure or is helpful* in "bed-wetting", without qualification, which to the public carries the thought that it is helpful in *all* cases of bed-wetting.

■ In seeking to achieve fair competition in commerce by preventing unfair methods of competition and unfair or deceptive practices, a negative statement that a device *does not* achieve results in certain cases may be as effective as the command "Thou shalt not" is in morals. But we are dealing here with more than a negative statement. What is proposed in the order of the Commission, as modified, is to compel the petitioners to state, clearly and unequivocally, that the device does not achieve results in cases *caused* by organic defects or disease. This is a strong cautionary warning to the unwary, which would

> "forbid no activities except those which if continued would directly aid in perpetuating the same old unlawful practices." [50]

The final order of the Commission to cease and desist, dated October 2, 1959, under review, will be modified to read as follows:

> "It Is Ordered that respondents Maurice J. Feil and Leo A. Loeb, individually and as copartners trading as The Enurtone Company, or trading under any other name or names, and their respective agents, representatives, employees and lessees, directly or through any corporate or other device in connection with the offering for sale, sale, leas-

---

48. See, Cohens v. Commonwealth of Virginia, 1821, 6 Wheat. 264, 399–400, 5 L. Ed. 257.

49. 15 U.S.C.A. § 45(a).

50. Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 727, 68 S. Ct. 793, 816, 92 L.Ed. 1010.

ing or distribution of a device known as 'Enurtone', or any other device which functions in substantially the same manner in commerce, as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from representing, directly or indirectly:

"That the use of said device is of value in stopping bed-wetting or correcting the bed-wetting habit, unless expressly limited in a clear and conspicuous manner to cases of bed-wetting not caused by organic defects or diseases."

As so modified the Order is affirmed and ordered enforced.